**CITY OF CEDAR RAPIDS, Appellee,**

v.

**BOARD OF TRUSTEES OF the MUNICIPAL FIRE & POLICE RETIREMENT SYSTEM OF IOWA, Appellant,**

**Christian E. Cornish, Intervenor–Appellant.**

**No. 96–1356.**

Supreme Court of Iowa.

Jan. 21, 1998.

Alice E. Helle and James H. Gilliam of Brown, Winick, Graves, Gross, Baskerville, Schoenebaum and Walker, P.L.C., Des Moines, for appellant.

Connie Alt and Theresa C. Davis of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for intervenor-appellant.

James H. Flitz, Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and LAVORATO, SNELL, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

The issue is whether there was substantial evidence to establish legal causation for a mental/mental injury (a mental injury without an accompanying physical injury) in an accident disability claim under Iowa Code section 411.6(5) (1995). The board of trustees concluded there was and awarded the claimant accidental disability benefits. The district court disagreed and sustained a writ of certiorari sought by the city of Cedar Rapids to challenge the board's ruling. We reverse and remand.

### I. Background Facts and Proceedings.

Christian E. Cornish began working as a police officer for the Cedar Rapids Police Department in July 1970. He last worked for the department on June 9, 1994, when he was hospitalized for depressive symptoms. Over the twelve years before this, Cornish had an ongoing personality change.

In July 1994, Terri Gerdes, a staff psychiatrist at the University of Iowa Hospitals and Clinics, began treating Cornish. She treated Cornish through March 1995. In his initial visit, Cornish related several stressful events that occurred during his work as a police officer. Those included a motor vehicle accident in which Cornish saw two victims burn to death, a confrontation with an armed suspect, and a confrontation with an armed, suicidal citizen.

Cornish also told Gerdes that traveling near the sites of these events would lead to increased anxiety for him. In addition, Cornish revealed that he had been suffering recurring nightmares about the stressful, violent events he has faced on the job. In succeeding sessions with Gerdes, Cornish described continuing problems of nightmares, sleep disturbances, and symptoms of depression.

Gerdes diagnosed Cornish with posttraumatic stress disorder. According to Gerdes,

[o]ne of the essential criteria for [this diagnosis] is the exposure to a traumatic event or events in which the patient has experienced or witnessed an event that involved actual or threatened death or serious injury to himself or others, and the patient's response involved intense fear, helplessness or horror.

In Gerdes' opinion, the three traumatic events that Cornish had related to her caused or contributed to the development of his posttraumatic stress disorder. Gerdes described the traumatic events as "extraordinary in the sense that they involved overwhelming stresses from actual death or threatened death."

In November 1994, Cornish filed an application for accidental disability benefits pursuant to Iowa Code section 411.6. In the application, Cornish claimed he was totally and permanently incapacitated for duty as the result of an injury or disease incurred in or aggravated by the actual performance of duties as a police officer.

On April 21, 1995, the medical board, as specified in Iowa Code section 411.5(8), certified in writing that Cornish "is physically incapacitated from performance of the functional demands of his position.... This incapacity is likely to be permanent." The medical board attributed the disability to posttraumatic stress disorder with a major depressive disorder.

On May 4, 1995, the Municipal Fire and Police Retirement System of Iowa (System) determined that Cornish was entitled to "ordinary disability retirement" benefits because of his disability. *See* Iowa Code § 411.6(4). Cornish filed an appeal with the System in which he challenged the classification of his disability as "ordinary" rather than "accidental." A three-member disability appeals committee heard the appeal and took evidence.

At the hearing, the committee received evidence from Cornish and others about the three traumatic incidents that caused his posttraumatic stress disorder with a major depressive disorder. The committee also had the medical board's opinion about Cornish's disability.

The committee found that Cornish was permanently incapacitated for the further performance of duty because of his posttraumatic stress disorder with a major depressive disorder. The disability, the committee concluded, was a result of two of the three traumatic incidents Cornish testified to at the hearing: the automobile fire in which two victims burned to death and his confrontation with an armed suspect. According to the committee, these two incidents "constituted more than the day-to-day emotional stresses commonly associated with police work." In a two-to-one ruling, the committee awarded Cornish accidental disability benefits rather than ordinary disability retirement benefits.

Later, the System's Board of Trustees accepted the committee's decision as the final decision of the System.

The city of Cedar Rapids sought a writ of certiorari in the district court, which the court granted. Cornish was allowed to intervene in these proceedings. The district court sustained the writ of certiorari and annulled the award of accidental disability benefits to Cornish. The court concluded that the award was "not supported by the law or the facts of this case."

The board appealed. Cornish, as intervenor, joined the appeal and filed a brief.

## II. *Scope of Review.*

We recently summarized the applicable scope of review principles for cases like this in *Cedar Rapids v. Municipal Fire & Police Retirement System of Iowa,* 526 N.W.2d 284 (Iowa 1995):

Iowa Code chapter 411—Retirement Systems for Police Officers and Firefighters—does not contain any appeal provisions. But a party receiving an adverse decision from the Board may seek judicial review of the Board's decision by filing a petition for a writ of certiorari.

Certiorari actions are proper when an inferior board, exercising judicial functions, acts illegally. An inferior board acts illegally if it has not acted in accordance with a statute or if its decision was not supported by substantial evidence. Evidence is substantial "when a reasonable mind could accept it as adequate to reach the same findings." Evidence is still substantial even though it would have supported contrary inferences.

526 N.W.2d at 286–87 (citations omitted).

The board argues it applied a correct standard of law and reached a conclusion that was supported by substantial evidence.

## III. *The Applicable Statutory Provisions.*

It is undisputed that Cornish is permanently incapacitated for the further performance of duty as a result of his mental disorder and that he is entitled to some type of disability benefits under chapter 411. The question is whether he is entitled to ordinary disability retirement benefits or accidental disability benefits.

Iowa Code section 411.6(3) covers ordinary disability retirement benefits and provides in part:

*Ordinary disability retirement benefit.* Upon application to the system, of a member in service or of the chief of police or fire departments, respectively, any member shall be retired by the system, not less than thirty and not more than ninety days next following the date of filing the application, on an ordinary disability retirement allowance, if the medical board after a

medical examination of the member certifies that the member is mentally or physically incapacitated for further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired. . . .

Iowa Code section 411.6(5) covers accidental disability benefits and provides in part:

*Accidental disability benefit.*

a. Upon application to the system, of a member in service or of the chief of the police or fire departments, respectively, any member who has become totally and permanently incapacitated for duty as the natural and proximate result of an injury or disease incurred in or aggravated by the actual performance of duty at some definite time and place, or while acting pursuant to order, outside of the city by which the member is regularly employed, shall be retired by the system, if the medical board certifies that the member is mentally or physically incapacitated for further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired. . . .

Iowa Code section 411.6(5)(c) defines "disease" to "mean heart disease or any disease of the lungs or respiratory tract and shall be presumed to have been contracted while on active duty as a result of strain or the inhalation of noxious fumes, poison or gases. . . ."

"Accidental" disability benefits are greater than "ordinary" disability retirement benefits. *Compare* Iowa Code § 411.6(6)(b), *with id.* § 411.6(4). There may also be certain tax advantages. *See Moon v. Board of Trustees Mun. Fire & Police Retirement Sys.*, 548 N.W.2d 565, 568 (Iowa 1996).

According to section 411.6(5), three basic issues are usually present in an accidental disability claim: (1) permanent incapacity; (2) causation by a work duty; and (3) "injury" or "disease." As mentioned, "disease" is defined in section 411.6(5)(c) and is not an issue here. There is no issue surrounding Cornish's permanent incapacity. There is also no issue that Cornish's posttraumatic stress disorder with a major depressive disorder was related in some way to perfor-

mance of a work duty. The remaining issue concerns "injury" as used in section 411.6(5).

IV. *The Meaning of "Injury" in Iowa Code Chapter 411.*

▬ We accepted nontraumatic mental injuries as compensable under our workers' compensation statutes in *Dunlavey v. Economy Fire & Casualty Co.*, 526 N.W.2d 845, 851 (Iowa 1995) (holding that the phrase "personal injuries" in Iowa Code section 85.3(1) includes a mental injury standing alone). For workers' compensation purposes, the injury must arise out of and in the course of the employment. Iowa Code § 85.3(1). This causation element requires two determinations: causation in fact and legal causation. *Dunlavey*, 526 N.W.2d at 853. In workers' compensation cases, factual causation means medical causation: the employee's injury must be causally connected to the employee's employment. *Id.* Legal causation is a policy question: How far will the law extend responsibility to those consequences which have in fact been produced? *Id.* Factual causation is therefore a factual issue whereas legal causation is a legal issue. *Id.*

Having concluded that the employee met his burden of proving medical causation for his mental injury by substantial evidence, we were faced in *Dunlavey* with establishing a standard for legal causation. In short, as a policy matter what were we going to require a claimant to prove to establish the legal causation requirement? We adopted the following standard for legal causation:

[I]n order for an employee to establish legal causation for a nontraumatic mental injury caused only by mental stimuli, the employee must show that the mental injury "was caused by workplace stress of greater magnitude than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs," regardless of their employer.

*Id.* at 857 (citation omitted).

The standard thus imposes two requirements: the claimant must show that the mental injury was caused (1) in fact by mental stimuli in the work environment, and (2) by workplace stress of greater magnitude

than the day-to-day mental stresses experienced by other workers employed in the same or similar jobs, regardless of their employer. *Id.*

Later, we adopted this two part test for nontraumatic mental injuries for disability cases under chapter 411. *See Moon,* 548 N.W.2d at 568. In *Moon,* the medical board concluded the claimant—a police officer—suffered a psychiatric condition (panic disorder with agoraphobia) that rendered him permanently incapacitated for duty as a police officer. The claimant alleged two incidents caused his disability. In one he confronted a man suspected of armed robbery who attempted to escape. The claimant did not shoot at the suspect for fear of hitting the claimant's partner. The claimant began having nightmares about the incident. In the other, a young officer committed suicide and the claimant was called to the scene. Just before the suicide, the claimant had disciplined the officer, and the claimant testified he felt guilty for not having identified the officer's problem.

In *Moon,* the board of trustees denied the claimant accidental disability benefits. The district court affirmed in the claimant's certiorari action. On appeal to us, we rejected the claimant's argument that the board had applied an erroneous legal standard. *Id.* at 569. We noted that *Dunlavey* was decided after the district court had entered its order. *Id.* at 568. Nevertheless, we concluded the board "impliedly recognized a right to nontraumatic accident benefits if the injury was 'more than day-to-day emotional stress commonly associated with police departments.'" *Id.* We determined this standard was close enough to the *Dunlavey* standard, which requires the stress be "of greater magnitude than the day-to-day mental stresses experienced by other [police] officers." *Id.* at 569 (quoting *Dunlavey,* 526 N.W.2d at 857).

We also concluded in *Moon* that there was substantial record evidence that the two incidents that allegedly caused the claimant's disability were no more than the day-to-day stresses commonly associated with police departments. *Id.* Although testimony from fellow officers was conflicting on this issue,

we determined substantial evidence supported the board's ruling. *Id.* at 569–70.

The board here did not have the benefit of our *Moon* decision; it, however, applied the same standard as the board in *Moon* had applied. This is apparent in these conclusions of law from the committee's decision here, which the board later adopted:

[Cornish] must ... establish that he is disabled as a result of an injury in order to establish entitlement to accidental disability benefits.

Cornish has the burden of proving that his mental injury was caused or aggravated by the performance of duty at some definite time and place, and that his mental injury was caused by something more than the day-to-day emotional stress commonly associated with police work.

The district court here did have the benefit of our *Moon* decision and concluded the board had applied the *Dunlavey* standard which we later adopted in *Moon.* We agree the standard the board used here was close enough to the *Dunlavey* standard to suffice.

V. *Substantial Evidence.*

We thus reach the decisive issue in this case: Was the Board's order "illegal" for certiorari purposes because it was not supported by substantial evidence? *See Moon,* 548 N.W.2d at 569.

In terms of the legal causation standard, the committee's conclusions of law stated:

The committee finds that Cornish's mental injury was caused by the traumatic incidents that were detailed at the hearing.

The committee further finds that the first two incidents testified to (the fire and the 1986 armed suspect) constituted more than the day-to-day emotional stresses commonly associated with police work.

As in *Moon,* the evidence was conflicting on whether the incidents that caused the disability were more than the day-to-day emotional stresses commonly associated with police work. James Kidwell, a former Cedar Rapids police officer, observed the fire incident to which the committee referred. In his affidavit he recounts the tragic fire:

When we arrived, we saw that the passengers in the car were two teenage boys. Although the car was burning at the time, one of the boys was still alive when we arrived and was screaming for help, asking us to get him out. All of the officers tried frantically to get a door open or break a window in order to pull the boys out. . . . Despite all of our attempts, we were unable to save the boys and instead had to watch helplessly as they were burned to death. . . .

While each police officer's experience varies greatly depending on the area to which they are assigned, this incident was extraordinarily traumatic for me and probably for other officers at the scene. This incident in no way could be considered a "day-to-day" type event.

In my experience as a police officer, incidents such as the one described above and incidents involving life and death situations in which your life is threatened by someone who is armed do not occur on a daily basis for the average police officer.

Cornish testified to the facts of each event he claimed led to his condition. Additionally, he testified to lacking concentration and to feeling "scared" and "too old to face people with guns and knives."

Cornish's friend, Cedar Rapids police officer Richard Brown, testified to the rarity of a police officer witnessing a person burning to death. He also testified to the rarity of a traffic officer confronting an armed person alone.

In contrast, Cedar Rapids police captain Thomas Erceg recounted events where he confronted armed suspects, where he helplessly witnessed the death of others, and where a routine traffic stop turned potentially deadly. Erceg also testified about a police officer's expectations in the Cedar Rapids police department:

Q. Have you seen some pretty gruesome sights out there? A. Absolutely.

Q. Do you think that most Cedar Rapids police officers expect in the course of a 20–year career to be put in a situation where they might see some pretty gruesome things? A. Yes.

Cedar Rapids administration and operations chief Richard Stephens also testified about what a police officer may expect to see:

Q. Do you think then most police officers after this time do or do not have an expectation that they're going to see some horribly violent episodes, may be the victim of personal violence, and may see people die right in front of their eyes? A. If they haven't experienced it already, they are well aware that that is a possibility for them, and most likely in Cedar Rapids because of the size of the city and the number of calls, we have a probability.

The city contends that, as to legal causation in a "mental/mental" case under chapter 411 such as this, the focus should not be on whether the facts underlying the claimed stress were unusual. Rather, the city asserts, the focus should be on whether the stress caused by the incidents is of a greater, unusual magnitude than that experienced by other police officers. The city argues strenuously that Cornish produced no substantial evidence upon which the board could reasonably have concluded the stresses he experienced were of a greater, unusual magnitude.

■ A. *The proper focus.* Our focus, of course, must be on whether there is substantial evidence that Cornish suffered "unusual stress." *See Dunlavey,* 526 N.W.2d at 855–56. The rationale for the rule is explained in *Graves v. Utah Power & Light Co.,* 713 P.2d 187 (Wyo.1986), the case from which we adopted the legal causation standard for mental/mental injuries in *Dunlavey:*

We think common-sense reasons for the [unusual stress] rule we adopt outweigh other considerations. If we allowed workers to recover for long-term mental injuries when those injuries were triggered by everyday work stress, then almost all mental injuries would be compensable from the worker's compensation fund. There are very few workers with nontraumatic mental problems who cannot show that job stress contributed to their problems. The employers would become insurers for almost all mental illnesses suffered by their employees.

*Graves,* 713 P.2d at 192.

The fact that the focus should be on whether the claimant has suffered unusual

stress does not mean we should ignore the incidents or employment situations giving rise to that stress. The nature of the incident claimed to have caused the unusual stress is certainly probative of the kind of stress that the incident has actually generated. Logically, the more extraordinary the incident the greater the stress. *See Waits v. United Fire & Cas.*, 572 N.W.2d 565 (1997) (holding that in personal injury case the way in which accident happened was relevant to prove whether the accident caused injuries to claimant and the nature and extent of any such injuries).

In *Moon*, when we considered the legal causation issue, we said:

> There is substantial evidence in the record to support the board's conclusion that the two *incidents* that allegedly caused Moon's disability were no more than the day-to-day stresses commonly associated with police departments.

*Moon*, 548 N.W.2d at 569 (emphasis added.) We went on to describe the incidents on which the claimant relied. *Id.* at 569–70. We were recognizing that the nature of the incidents was certainly relevant in determining whether the stress was unusual. In that case, we determined there was substantial evidence based on testimony from fellow police officers that the incidents were not unusual:

> Kenneth Moon, a Des Moines police officer and the plaintiff's brother, testified at the board hearing that, in his opinion, the incidents in question were not typical of the day-to-day experiences of police officers. *He also testified, however, that while a police officer's life is generally very routine and boring "[i]t can become very dangerous, in a split second. There's a lot of stress associated with the job . . . ."*
>
> Another officer testified that *"police work is more stressful on a day-to-day basis than the average occupation,"* and an officer testified *about counseling services the department provides for officers in recognition of their highly stressful position.* Even the plaintiff acknowledged that *"all police officers are faced with life and death every day and have a stress-related occupation."* The chief of police stated that *he*

*did not consider either of the specific incidents "exceptionally stressful for law enforcement work."*

*Id.* (emphasis added).

Here both the board and the district court considered the *incidents* in question relevant on the question whether the incidents generated unusual stress. The district court, however, determined—we think incorrectly—that the board's determination on this issue was not supported by substantial evidence.

■ B. *Substantial evidence that the incidents created unusual stress.* Turning to the effects of the incidents, we think Kidwell's description of the fire incident clearly supports a finding that the incident created unusual stress. Additionally, the incident was "extraordinarily traumatic" for Kidwell and "probably for other officers at the scene" as well. As Kidwell put it, "[t]his incident in no way could be considered a 'day-to-day' type event." Kidwell provided further substantial evidence that the fire incident and the armed suspect incident were unusually stressful:

> In my experience as a police officer, incidents such as the one described above and incidents involving life and death situations in which your life is threatened by someone who is armed do not occur on a daily basis for the average police officer.

Gerdes—the psychiatrist who first examined Cornish—described the incidents as "extraordinary in the sense that they involved overwhelming stresses from actual death or threatened death." Her description is further substantial evidence supporting the board's legal causation ruling.

Cornish described the events that led to his condition and the effects he suffered from them. Brown testified to the rarity of a police officer witnessing a person burning to death and of confronting an armed person alone. Their testimony lends further support to the unusual stress Cornish endured as a result of the incidents.

■ Based on testimony from Erceg and Stephens, the board could have found against Cornish on the legal causation issue. That fact, however, does not mean there was

insubstantial evidence to support the ruling the board made. Evidence is not insubstantial merely because it would have supported contrary inferences; nor is evidence insubstantial because of a possibility of drawing two inconsistent conclusions from it. *City of Hampton v. Iowa Civil Rights Comm'n,* 554 N.W.2d 532, 536 (Iowa 1996). In determining whether evidence is substantial to support a decision, the ultimate question is not whether the evidence supports a different finding, but whether the evidence supports the finding actually made. *Id.*

As the board points out, its membership by statute includes police officers. *See* Iowa Code § 411.36(1). So in addition to the usual expertise that administrative tribunals are acknowledged to have, this board is more than qualified to weigh the evidence and determine what are and what are not unusually stressful incidents for police officers. The board may capably do so because of its members' own work experience. We do not ask juries to leave their experiences and common sense behind when deliberating. We expect no more from the board.

## VI. *Disposition.*

We conclude there was substantial evidence to support the board's ruling. Cornish is therefore entitled to accidental disability benefits. We reverse the district court's order to the contrary and remand for an order annulling the writ.

**REVERSED AND REMANDED.**